## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:08CR00024 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **BRUCE EDWARD BAUMGARDNER** | ) | By: James P. Jones |
| **AND DOUGLAS LEE STALLWORTH,** | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Dennis E. Jones, Dennis E. Jones & Associates, P.C., Lebanon, Virginia, for Defendant Bruce Edward Baumgardner; and Timothy W. McAfee, Timothy W. McAfee, PLLC, Norton, Virginia, for Defendant Douglas Lee Stallworth.*

In this criminal case, after being convicted by a jury of drug crimes, both defendants have filed posttrial motions seeking a new trial or acquittal. For the reasons that follow, I will deny the motions.

I

The defendants Bruce Edward Baumgardner and Douglas Lee Stallworth were convicted by a jury in a joint trial of knowingly conspiring to distribute and to possess with intent to distribute fifty grams or more of crack cocaine, in violation of 21 U.S.C.A. §§ 841(b)(1)(A), 846 (West 1999 & Supp. 2009). Additionally, the jury

convicted Baumgardner of knowingly maintaining a place for the purpose of distributing a controlled substance in violation of 21 U.S.C.A. § 856(a)(1) (West Supp. 2009). They now move for a new trial or acquittal.

Fifty-one defendants were charged in this case for offenses relating to the distribution of crack cocaine. Following the Indictment, the defendants were severed into four separate groups for trial. Most of the defendants eventually pleaded guilty, and as to those who went to trial, all but one were convicted by juries.

At the second trial, which involved Baumgardner and Stallworth, codefendants Paul Vaughn and Derrick Evans testified for the government. The government contended that Baumgardner and Stallworth had served as low-level street distributors in a large, multifaceted drug trafficking conspiracy. Baumgardner and Stallworth argued that they were only drug addicts, not conspirators.

After Baumgardner and Stallworth were convicted, Vaughn and Evans began to recant their trial testimony and have moved to withdraw their guilty pleas. Because of that, on June 18, 2009, I held an evidentiary hearing where Vaughn and Evans testified.

- 2 -

In their posttrial motions currently before the court,[1] Baumgardner and Stallworth raise three issues: (1) whether both defendants deserve a new trial on the basis of the recanting statements made by Vaughn and Evans; (2) whether there was sufficient evidence to convict Baumgardner and Stallworth of conspiracy to distribute, to attribute fifty grams or more of crack cocaine to Stallworth, and to convict Baumgardner of maintaining a place for drug distribution; and (3) whether an alleged *Brady* violation merits a new trial.

These motions have been briefed by both defendants and are now ripe for decision. I will address them in turn.

II

Under all the circumstances, including my opportunity to preside at all of the trials and hearings in the case and my review of the extensive record, I do not believe that either Vaughn or Evans fabricated their prior trial testimony.

---

[1] Baumgardner filed a Motion for Judgment of Acquittal or for a New Trial and a Memorandum in Support of Motion for a New Trial. Stallworth filed a Motion for Judgment of Acquittal or for a New Trial, Motion for New Trial, Second Motion for New Trial, and Memorandum in Support of Motion for New Trial.

A

Early in this case, Vaughn and Evans agreed to cooperate with the government. Vaughn testified at the Grand Jury proceeding. They each signed plea agreements and testified consistently at trial. In advance of the fourth trial, however, Vaughn and Evans sent letters to the court recanting their prior testimony. At the evidentiary hearing, Vaughn and Evans testified and affirmed statements made in their letters.

1

Vaughn and Evans provided detailed testimony for the government. Vaughn testified before the Grand Jury and at the first and second trials. Evans testified at the first three trials.[2]

On May 28, 2008, Vaughn testified before the Grand Jury. He acknowledged that he was "currently charged in [the] case and [was] subject to being indicted . . . [.]" (Hr'g Gov't Ex. 1 at 3, June 18, 2009.) He knew that he could be charged with perjury if he told "a willful falsehood to the Grand Jury." (*Id.* at 4.)

Vaughn told the Grand Jury that Derrick Evans, Oedipus Mumphrey, Kerry Lee, Charles King, Tyree Slade, Marcus Watkins, Andre Watkins, Reginald Morton,

---

[2] The first trial, which began on October 6, 2008, involved defendants Anthony Eugene Duty, Robin Marie Davis, and Evans' wife, Christine Evans. The second trial, which began on October 27, 2008, involved defendants Stallworth and Baumgardner. The third trial, which began on December 15, 2008, involved Travis Dell Jones and Brian Kendall Morrison.

- 4 -

Emanuel Morton, and Brian Morrison traveled from Burlington, North Carolina to Bristol, Virginia, and Bristol, Tennessee, to sell crack cocaine. Vaughn explained that Evans had provided Watkins and Mumphrey locations from which to distribute crack cocaine. Mumphrey sold crack at a Bristol motel. Vaughn acted as a lookout. Reginald Morton and his girlfriend Jessica Rodriguez, an individual named Drake, and Candace Maynard helped deliver the crack for Mumphrey.

On his first trip to the Bristol region, Vaughn and others encountered law enforcement. Vaughn, Mumphrey, Reginald Morton, Emmanuel Morton, Drake, and Rodriguez traveled to Bristol from Burlington in three separate cars. While at a motel, law enforcement officers searched one of the cars. In it they found materials used to transform powder cocaine into crack cocaine, including a hot plate and a scale. Officers did not search the car driven by Rodriguez, a gold Buick, which contained two kilograms of cocaine. After this, Vaughn and the others returned to Burlington.

On a different occasion, Mumphrey paid Vaughn $1,000 to drive him to Bristol. They went to a mobile home on Anderson Street in Bristol, Tennessee to sell crack. Vaughn again served as a lookout. In November, 2007, a mobile home in the neighborhood caught on fire. Several law enforcement and emergency personnel arrived at the scene. While outside, Mumphrey and Vaughn were approached by two

- 5 -

officers. They gave the officers false names, leading to their arrest. The officers found the keys to Mumphrey's grandmother's car, which Mumphrey was driving, and searched it. In it, they discovered crack cocaine.

Vaughn described a dispute he had with Mumphrey after their arrest. Mumphrey bailed Vaughn out of jail. He then asked Vaughn to take his gun back to North Carolina in a separate car. Vaughn refused. In retaliation, Mumphrey assaulted Vaughn and kicked him out of his mobile home. Vaughn returned to North Carolina alone. Later, in Burlington, Mumphrey insisted that Vaughn take responsibility for the drug charge that had resulted from the arrest in November, 2007. Vaughn again refused. Again in retaliation, Mumphrey struck Vaughn in the ribs with a wrench and knocked him unconscious.

During his Grand Jury testimony, Vaughn provided information about specific individuals. Lee traveled to Bristol from Burlington to supply cocaine to various distributors. At first, he operated from Mumphrey's mobile home, but then moved to Frederick Cato's house, where he was eventually arrested. Vaughn described one occasion when Lee gave him $18,000 to give to Mumphrey for a half-kilogram and a "big eight[,]" which he defined as four-and-a-half ounces. (*Id.* at 18.)

Vaughn identified various associates and customers of Mumphrey. Baumgardner bought a quarter-ounce of crack from Mumphrey at least four or five

times a day. Shantha Calhoun visited Mumphrey to buy half-ounces of crack, and then resold it. Defendant Stallworth bought small quantities of crack from Mumphrey at his mobile home on Anderson Street. Vaughn stated that Stallworth "was a good customer." (*Id.* at 21.) Marcus Watkins regularly bought two ounces of crack from Mumphrey. Marcus Watkins' girlfriend, Le Ann Berry, was "real, real tall" and acted as Watkins' runner. (*Id.* at 22.) Vaughn observed Mumphrey sell a half-ounce to King and give a half-ounce to Andre Watkins. Mumphrey also supplied Brian Morrison. Tyson Anderson and Tamaray Lea worked as lookouts for Mumphrey and Marcus Watkins. Additionally, Vaughn testified that Lee and Mumphrey ran Evans' drug business while Evans was in jail. Vaughn knew that some of the individuals who traveled from Burlington to Bristol had worked for Evans' recording label called "Kant Stop Records," and had a reputation for dealing drugs.

On May 28, 2008, the Grand Jury returned the Indictment. Over the following four months, Vaughn and Evans signed plea agreements with the government. Under the terms of each Plea Agreement, Vaughn and Evans agreed to plead guilty to the conspiracy charge and to cooperate with the government and disclose their knowledge of any criminal activity. In return for Evans' cooperation, the government agreed to dismiss two of his three prior North Carolina felony drug convictions from a Sentencing Enhancement Information, a benefit that reduced the applicable

statutory mandatory minimum sentence from life imprisonment to twenty years. *See* 21 U.S.C.A. § 841(b)(1)(A) (providing for mandatory minimum sentence of twenty years if there is a prior felony drug conviction and for a mandatory minimum sentence of life imprisonment without release if there are two or more prior felony drug convictions) and 21 U.S.C.A. § 851(a)(1) (West 1999) (providing that a person cannot be sentenced to increased punishment by reason of one or more prior convictions unless government files information stating the previous convictions to be relied upon). In Vaughn's Plea Agreement, the government agreed to do the same with respect to one of Vaughn's two prior North Carolina felony drug convictions.

I accepted the pleas of Vaughn and Evans at their guilty plea hearings. They confirmed that they had had an adequate opportunity to discuss their case with their attorneys, and to read and discuss the Plea Agreements with their lawyers. They stated that they were fully satisfied with their lawyer's representation. The terms of each Plea Agreement were summarized by the prosecutor and Vaughn and Evans each agreed that those terms were included as they understood their agreements. They agreed that no promises had been made to them other than those contained in their Plea Agreements, and that no one had attempted in any way to force them to plead guilty.

After I accepted their plea of guilty, Vaughn and Evans appeared for the government at subsequent trials of their codefendants and gave consistent testimony. They demonstrated a detailed understanding of their Plea Agreements with the government, explained their background in drug distribution and their involvement in the charged conspiracy, and testified about their relationship with other defendants and the extent of their criminal activity.

First, Vaughn and Evans each acknowledged the terms of their Plea Agreements. They understood that they faced a mandatory minimum sentence of twenty years in prison and that they could potentially receive a life sentence. They affirmed that the government had not promised them anything for their cooperation. They hoped for leniency, but understood that their sentence would be set by the court, and not the government.

Next, Vaughn and Evans each described how they became involved with the distribution of crack cocaine in Burlington. Vaughn testified that Mumphrey had introduced him to crack distribution and that through Mumphrey he had met Evans, Lee, and Marcus Watkins. The lucrative drug trade enticed Vaughn. Mumphrey gave him his "first pair of Jordans." (Duty Trial Tr. 65, vol. I, Oct. 7, 2008.)[3] Vaughn

_____

[3] The "Duty Trial" refers to the trial of Duty, Davis, and Christine Evans. The "Stallworth Trial" refers to the trial of Stallworth and Baumgardner.

Case 1:08-cr-00024-JPJ   Document 2099   Filed 08/06/09   Page 9 of 40   Pageid#: 11687

stated that Evans "would basically man handle somebody, or take their drugs, or sell at their spot . . . ." (*Id.* at 66-67. ) Lee would "front" drugs to distributors, which meant that distributors would obtain drugs from Lee in advance of payment. (*Id.* at 67.) Mumphrey supplied crack to Marcus Watkins, who then sold it. Evans testified that in Burlington, he was a "go getter," which meant that he robbed drug dealers of their supply and sold it to other drug dealers for a less expensive price. (Duty Trial Tr. 181, vol. II, Oct. 8, 2008.)

Finally, Vaughn and Evans each testified about their drug dealings in Bristol and about their relationships with other drug dealers. Vaughn explained that he had made several trips to Bristol with Mumphrey. As to the Grand Jury, Vaughn related the story about his encounter with law enforcement at the motel, except he added that once they had returned to Burlington, Mumphrey had given Reginald Morton thirteen-and-a-half-ounces of cocaine out of the supply. Mumphrey returned to Bristol without Vaughn and sold the remainder.

Vaughn testified that he and Mumphrey initially sold crack from various motels in the Bristol area. Vaughn acted as a lookout. He watched for police while Mumphrey distributed the crack. Mumphrey regularly met with Stallworth and Stallworth bought quarter-ounces of crack on a regular basis. Then, Mumphrey established a distribution point at a mobile home on Anderson Street in Bristol,

- 10 -

Tennessee. Again, Vaughn testified that he had been a lookout at the mobile home. Both Baumgardner and Stallworth bought crack from Mumphrey at the mobile home. Stallworth bought "fifties" and eight-balls (3.5 grams). (Stallworth Trial Tr. 108, vol. I, Oct. 28, 2008.) Vaughn explained that a "fifty" was "a fifty of a quarter ounce, like half a gram" and that a "hundred rock" was a gram, "$100 worth of cocaine." (*Id.* at 108-09.) Baumgardner bought quarter-ounces three or four times a day and was Mumphrey's "VIP." (*Id.* at 107.)

Vaughn accounted for the circumstances of his arrest in November, 2007, just as he did in front of the Grand Jury. He added that the police had found $3,000 on him, which he stole from Mumphrey. He testified that Berry, who was known as "Seven [F]ooter," purchased crack from Mumphrey and delivered it to her boyfriend Marcus Watkins. (Duty Trial Tr. 77, vol. I, Oct. 7, 2008.) As he did to the Grand Jury, Vaughn explained that on one occasion, Lee had given Vaughn $18,000 to give to Mumphrey for half a kilogram and a "big eight." (*Id.* at 78.)

Evans testified that one of his drug robbery victims had eventually retaliated, causing him and his family to move to Johnson City, Tennessee, near Bristol. Once there, Evans' cousin, Alexander Poole, introduced him to Stallworth. Stallworth convinced Evans to move to Bristol, because it was "wide open" for crack distribution. (Stallworth Trial Tr. 13, vol. I, Oct. 28, 2008.) Evans established his

first distribution point in Bristol, Virginia. Thereafter, Stallworth acted as a middleman between Evans and other users.

Evans explained that he had had two main sources of supply: Bryant Kelly Pride and Lee. Evans brought Pride to Bristol, after Pride was released from prison in North Carolina. They sold crack out of a house on Texas Avenue. No dealer trusted Evans, given his history of drug robberies, so Pride traveled alone to purchase their product. Evans purchased kilograms of cocaine from Pride, which Evans then distributed to the customer base that he had established in the area.

Evans stated that at some point, Evans and Pride had traveled to Atlanta. Lee, a cousin to Evans, traveled from Burlington to Bristol to take Evans' "spot," meaning that while Evans was in Atlanta, Lee sold drugs from the same house that Evans used as a distribution point. (Duty Trial Tr. 189, vol. II, Oct. 8, 2008.) Evans and Lee subsequently became partners. They bought crack in Burlington and distributed it in the Bristol area. They imported as much as five kilograms of cocaine on each trip. For approximately two or three years, Evans regularly dealt in kilograms.

Evans testified that when Lee moved to the Bristol area, Mumphrey came with him. Mumphrey originally worked for Lee, but then established his own distribution ring with the help of Vaughn and Reginald Morton. Evans knew that Mumphrey had sold crack from a mobile home on Anderson Street in Bristol, Tennessee. He added

- 12 -

that across that street was Morton, selling from a different mobile home. Mumphrey

eventually supplied Evans; first with small quantities but then with kilograms.

Additionally, Evans testified that he had used the profits from his drug trade

to establish a music recording label called Kant Stop Records. It involved several of

his codefendants, including Marcus Watkins, Slade, Andre Watkins, and King. After

the company failed financially, some of its members joined Evans in his drug

pursuits.

Evans explained that his cohorts helped him maintain his drug business while

he was jailed on state charges for possession of marijuana. During trial, the

government introduced telephone calls that Evans had made from a local jail. During

one conversation, Evans directed Anderson "to cut [his] phones off." (Stallworth

Trial Tr. 32, vol. I, Oct. 28, 2008.) Evans, Lee, Mumphrey, and Vaughn used cell

phones to communicate with their customers. The phones were vital: Evans testified

that approximately 70 to 100 addicts in the area knew his number and that

approximately 500 addicts knew the number of either Evans, Lee, Mumphrey, or

Vaughn. While Evans was in jail, Mumphrey obtained Evans' phones and gave them

to Lee so that Lee could make money. Lee had again left Burlington for Bristol. He

distributed crack from Cato's house with help from Mumphrey and Vaughn. That

- 13 -

attracted attention, and law enforcement executed a search warrant there. Because of that, Evans ordered Anderson to cut the phones off.

The recorded jail conversations also demonstrated Evans' relationship with his family. Evans testified that he had attempted to isolate his wife and children from his drug business.

Evans testified against specific defendants. He stated that he had sold crack from Duty's car shop on Sixth Street in Bristol, Tennessee, that he had paid Duty crack for rent, and that Duty often served as a middleman between him and other users who frequented Duty's shop. Stallworth and Baumgardner bought crack from Evans at Evans' garage on Mary Street in Bristol, Virginia. Occasionally, Baumgardner and Stallworth did errands for Evans in return for crack.

2

After the first three trials, Vaughn and Evans sent a series of letters to the court in which they recanted their prior testimony. At the evidentiary hearing, Vaughn and Evans testified under oath and insisted that the statements in their letters were true.

In his recanting letters to the court and at the evidentiary hearing, Vaughn contended that he had been coerced into his Plea Agreement and that he had fabricated his testimony at the Grand Jury proceeding and at trial.

- 14 -

Vaughn sent his first letter to Baumgardner's lawyer. He claimed that the "District Attorney" had stated that if he refused to testify against Baumgardner, he would receive a life sentence, but that if he testified he would not do any prison time. (Baumgardner Mot. for Acquittal or a New Trial, Ex. 1, Dec. 17, 2008.) Vaughn also stated that "they" had promised to find him a job if he cooperated, and mentioned that he had a tape recording of Mumphrey stating that the "dope" was not Vaughn's. (*Id.*)

In a letter dated May 6, 2009, Vaughn asked to withdraw his guilty plea. He maintained that his statements to the Grand Jury were false, that he was coerced by his lawyer, the prosecutor, and law enforcement personnel, and that he had a tape recording of Burlington Police Detective Dalton Majors threatening him with a life sentence.[4] Vaughn stated that he signed his Plea Agreement because his lawyer and the prosecutor told him that he would get a life sentence without it. Vaughn insisted that his family would testify to demonstrate that he had been threatened.

Vaughn repeated these same statements in a letter dated May 13, 2009, but added detail. He stated that while in court, he was unable to speak because the United States Marshals Service had intimated him and that the presiding judge and the prosecutor had manipulated his lawyer. He also added that Detective Majors, the

---

[4] In his letters, Vaughn referenced a "Detective Myers." At the evidentiary hearing, it was explained that "Detective Dalton Majors" is the correct name, and I will refer to him in that manner.

prosecutor, and Drug Enforcement Administration Special Agent Todd Brewer used subornation of perjury against him and that while speaking to Agent Brewer he had been denied an attorney. Vaughn asserted that Detective Majors had threatened him with a life sentence if he did not travel to Bristol, Tennessee, to speak with Agent Brewer. Vaughn stated that during his interview with Agent Brewer, he was shown pictures of defendants in this case and made false statements about each of them. Finally, Vaughn alleged that the prosecutor and his attorney lied to his mother and that the court had abused its power.

During the evidentiary hearing, several undated letters to the court from Vaughn were admitted as exhibits. In his first letter, he alleged that Agent Brewer had told him that if he cooperated, he would not be charged with conspiracy. He claimed to have lied about Mumphrey and Morton because Mumphrey had severely beaten him. He claimed that the threats made by Agent Brewer, the prosecutor, and Detective Majors were recorded on a tape. He alleged that Detective Majors had attempted to force him to buy drugs off of people he did not know and had refused him an attorney. He averred that the prosecutor had tried to intimidate other defendants with letters which stated that Vaughn was going to get a life sentence because of his recantations. Vaughn claimed that he had lied for the benefit of his mother.

- 16 -

In another letter admitted during the hearing, Vaughn claimed that every statement made in this case had been based on hearsay. He again claimed that the prosecutor and law enforcement officers had coerced and threatened him. He mentioned two tapes: one with an exculpatory statement by Mumphrey and another with the DEA stating that he did not need a lawyer. He then listed twenty defendants he had lied about.

In a different letter, Vaughn specifically mentioned Reginald Morton, and claimed that the statements he made about him were false. He stated that "the people that are testifying against Morton I got them indicted, now there lieing [sic] on him to get a lesser sentence and nobody period would be testifying against Morton if I wouldn't have lied about the hole [sic] case ." (Hr'g Def.'s Ex. 3, June 18, 2009.) He also stated that his lawyer and the prosecutor had told him that if he did not cooperate, Robert Meade would testify against him at trial.

At the evidentiary hearing, Vaughn's counsel advised him to assert the Fifth Amendment privilege to avoid self-incrimination. Nonetheless, Vaughn testified that he had lied during the first trial. He stated that he had made a mistake when he pleaded guilty. He alleged that Detective Majors and Agent Brewer had promised that he would not go to jail if he cooperated, and that he had lied at trial when he testified that the government had not promised him anything for his cooperation. He

- 17 -

admitted that he had committed perjury and cited a statute that pertained to subornation of perjury.

Vaughn testified that he had lied during the second trial and that his statements in his letter to Baumgardner's attorney were true and that he had written them without help. He stated that he had never seen Baumgardner "with crack cocaine a day in [his] life . . . ." (Hr'g Tr. 25, June 18, 2009.) He insisted that he did not know Baumgardner, and that he didn't know anything about him being a valuable customer of Mumphrey's. He claimed to be unable to remember that at trial he had described different drug amounts and how much they cost. He testified that he had lied when he said Baumgardner went to Mumphrey's mobile home to buy crack and that he had lied when he testified in front of the Grand Jury.

Additionally, Vaughn recanted every incriminating statement he had made about Stallworth. He testified that he did not know Stallworth and that he had never seen him outside of court. He also believed that Detective Majors tricked him into talking with Agent Brewer.

When questioned by the prosecutor, Vaughn claimed that he had been a drug dealer in the past, but since then he had had a religious experience, and therefore did not remember anything about his former drug trade. He acknowledged that a snitch was someone who cooperated with the government, and that people in jail often

- 18 -

assaulted snitches. He testified that in jail he had been housed with Baumgardner, Marcus Watkins, Reginald Morton, King, Duty, and Mumphrey. After he had been housed with Baumgardner, he began to write letters to the court recanting his testimony.

Vaughn testified that when he met with Agent Brewer, other law enforcement officers from Virginia and Tennessee were present. He affirmed that he had provided information about drug activity in the area, and that he had identified different locations in Bristol that were associated with drug activity. He agreed that his testimony at the Grand Jury proceeding was similar to the information he provided to law enforcement.

When asked about his trial testimony against Baumgardner and Stallworth, Vaughn stated that "Satan had me so much in bondage I don't remember what day it was and what I said." (*Id.* at 62.) When asked which agent from the Federal Bureau of Investigation had coerced him, he provided Agent Brewer's name, who works for the DEA. Vaughn testified that he had given Agent Brewer false statements, and that Agent Brewer had included those false statements in Vaughn's affidavit. Vaughn claimed to have reviewed that affidavit before he testified at the Grand Jury proceeding. Vaughn gave varying explanations for why the handwriting in each of his letters were different.

- 19 -

In response to my questions during the hearing, Vaughn believed that he was not at risk for recanting his testimony under oath, based on his understanding of subornation of perjury.

After the evidentiary hearing, Vaughn filed a pro se Motion to Withdraw Guilty Plea. He claimed that his previous lawyer had threatened him with an inadmissible statement, which caused him to lie about fifty-one defendants, and withdrew as counsel, which violated his Sixth Amendment right to counsel. He repeated the same statements about Agent Brewer and Detective Majors, but added that Detective Majors had brought him to Tennessee without a warrant, which was "abduction." Finally, he averred that he had not had access to discovery materials before he signed his Plea Agreement.

Evans also provided recanting letters and statements to the court. On March 17, 2009, in a sworn affidavit, Evans stated that if he was called as a witness against Morton, he would testify that Morton was not involved in the conspiracy, and that this case was "based on lies [and] threats." (Hr'g Gov't Ex. 13, June 18, 2009.)

In his letter to the court dated April 12, 2009, Evans maintained that he had sold only user quantities, and knew only twenty-six of the fifty-one defendants indicted in the case. Notably, Evans stated that he would "continue to willingly and truthfully testify[,]" and only asked that "this so-called conspiracy . . . be looked

- 20 -

into." (Hr'g Gov't Ex. 12, June 18, 2009.)  Finally, in a letter dated May 18, 2009, Evans claimed that while housed in the same jail cell, he and Lee had fabricated stories to make their proffer statements to the government appear more attractive.

At the evidentiary hearing, Evans claimed that he had falsified part of his trial testimony.  He indicated that he and Lee had exaggerated the extent of the collaboration between them.  He denied that he and Lee had worked together to transport drugs from Burlington to Bristol, that he had robbed dealers of their drug supply, that he had given Lee and Mumphrey a location and phones to make money, or that he had established a mobile home for Mumphrey's use in selling drugs.

On the other hand, Evans confirmed other aspects of his testimony.  He related that he had truthfully testified about Duty, Davis, Baumgardner, and Stallworth.  He confirmed that the government had not made any promises to him, except for those contained in his Plea Agreement.  He admitted that he was a drug dealer.  Yet he stated that based on his "legal studies" in jail, he believed that he could get out of his Plea Agreement because of duress.  (Hr'g Tr. 94, June 18, 2009.)

B

A motion for a new trial based upon a witness's recantation should be granted only when:

- 21 -

(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*United States v. Wallace*, 528 F.2d 863, 866 (4th Cir. 1976) (adopting the test of *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928), *overruled by United States v. Mitrione*, 357 F.3d 712 (7th Cir. 2004) (asking instead whether there was a reasonable probability that without the recanted testimony the jury would have reached a different conclusion)).

Because I find that the recantations of Vaughn and Evans are not credible, I do not believe that their trial testimony was false. In comparison to their testimony at trial, the recantations are overwhelmingly inconsistent and unreliable. I also find that the recantations were partly motivated by the pressure or intimidation likely exerted on them by their codefendants in prison, and partly motivated by the misguided and self-created illusion that by recanting their trial testimony, they would somehow avoid punishment for their crimes.

I do not believe that either Vaughn or Evans fabricated their prior trial testimony. Vaughn's testimony at the Grand Jury proceeding and at two trials was consistent. At each proceeding, he identified defendants who had traveled from Burlington to Bristol to sell crack cocaine, discussed his encounter with law

- 22 -

enforcement at the motel, and described his arrest at Mumphrey's mobile home, where he had worked as a lookout. He also related a transaction between him, Lee, and Mumphrey that involved $18,000, a kilogram and a "big eight." (Hr'g Gov't Ex. 1 at 18, June 18, 2009.) He identified Mumphrey's customers, including Baumgardner, Stallworth, and Marcus Watkins. At the Grand Jury proceeding, Vaughn described the girlfriend of Marcus Watkins, Le Ann Berry, who helped Watkins sell crack, as "real, real tall" (*id.* at 22), and at trial, testified that her street name was "Seven [F]ooter." (Duty Trial Tr. 77, vol. I, Oct. 7, 2008.)

Likewise, Evans described similar events at each of the first three trials. For example, he testified that in Burlington, he had robbed other drug dealers of their supply; that with the help of Pride and Lee he had bought crack in Burlington and distributed it in Bristol; that Lee had taken his "spot" when he traveled to Atlanta (Duty Trial Tr. 189, vol. II, Oct. 8, 2008); that Mumphrey had distributed crack from a mobile home on Anderson Street in Bristol and that Vaughn had helped him; and that he had attempted to start a recording label, Kant Stop Records.

Vaughn and Evans testified that they became involved with drugs in Burlington. Evans' testified that he robbed drug dealers, and Vaughn stated that Evans "would basically man handle somebody, or take their drugs . . . ." (*Id.* at 66.) Vaughn stated that the members of Kant Stop Records had been known to sell drugs,

- 23 -

and Evans testified that members assisted him in his drug dealings when the company failed. Vaughn testified that Mumphrey and Lee ran Evans' drug business while he was in jail, and Evans testified that Mumphrey had taken his phones, which contained valuable customer lists, and had given them to Lee to continue dealing drugs.

Statements made by other witnesses at trial who have not recanted corroborate the prior testimony of Vaughn and Evans. For instance, both Timothy Norton and Gregory Meade testified that they had bought small amounts of drugs from Stallworth, consistent with Vaughn's testimony that Stallworth regularly bought quarter-ounces of crack from Mumphrey, and with Evans' testimony that he had sold Stallworth crack and that Stallworth acted as a middleman between him and users.

Compared to their trial testimony, I find that the recanting statements by Vaughn and Evans are not credible.

Vaughn's contention that he was coerced into signing his Plea Agreement is unpersuasive. At both his guilty plea hearing and at trial, he stated under oath that he understood the terms of his Plea Agreement and affirmed that no promises had been made to him. In his letters and at the evidentiary hearing, Vaughn gave varying explanations as to why he believed that he had been coerced. For instance, in his first letter, Vaughn explained that the prosecutor had threatened him with a life sentence if he did not testify against Baumgardner and that he would be given a job in return

for his cooperation.  But on January 16, 2009, at a meeting with the prosecutor, Agent

Brewer, DEA Agent Mike Baker, and Vaughn's attorney, Vaughn told Agent Brewer

that he wrote his first letter because "he felt very guilty seeing Mr. Baumgardner and

knowing that [he] was possibly looking at a sentence of life . . . ."  (Hr'g Tr. 120, June

18, 2009.)  In later letters, Vaughn did not mention Baumgardner, but alleged that he

had been threatened not only by the prosecutor, but also by his own lawyer and law

enforcement personnel.  Yet at the January 16, 2009 meeting, Vaughn told Agent

Brewer that "he was not threatened or coerced to cooperate."  (*Id.*)

Similarly, the more general allegations made by Vaughn and Evans fluctuate

from letter to letter.  For example, Vaughn mentions that he has tape recordings of

various threats and promises.  In his first letter, he mentions a tape recording of

Mumphrey stating that the dope discovered at his arrest in November, 2007 did not

belong to Vaughn.  In his letter dated May 6, 2009, Vaughn claimed to have a tape

recording of Detective Majors threatening him with a life sentence.  Vaughn made the

same statement in a subsequent letter, but implicated Agent Brewer and the

prosecutor.  A different letter stated that Vaughn had a tape of a DEA agent telling

him that he did not need a lawyer.  In the end, the only tape presented to the court

evidenced a phone call between Vaughn and Detective Majors, and it revealed no

threats or promises.

Vaughn made allegations against the Marshals Service, the court, and the prosecutor. He believed that the court and prosecutor had manipulated his attorney, that the prosecutor had threatened and lied to his mother, that the prosecutor had tried to intimidate other defendants, and that the Marshals Service prevented him from speaking in court. There is simply no evidence to validate these claims.

In one instance, Vaughn claimed that he lied about Mumphrey because Mumphrey had beaten him and that he lied for the benefit of his mother. In another instance, he claimed that each of his statements in this case were based on hearsay. In one letter, Vaughn mentioned only Reginald Morton, but in another, he listed the names of twenty defendants he had lied about.

At the evidentiary hearing, Vaughn claimed that he had made a mistake when he pleaded guilty. In his testimony, he displayed a religious influence. He claimed that he could not remember his prior testimony about different drug terms because he had been "resurrected" and that he could not remember his prior testimony about Stallworth and Baumgardner because at their trial "Satan had [him] so much in bondage . . . ." (Hr'g Tr. 63, June 18, 2009.)

After the evidentiary hearing, Vaughn filed a pro se Motion to Withdraw Guilty Plea that conflicts with the statements he made in his letters and with his testimony at the evidentiary hearing. He claimed that his attorney had threatened him with an

- 26 -

inadmissible statement, that he had been abducted by Detective Majors, and that he had not reviewed his discovery materials before he signed his Plea Agreement.

That Vaughn was abducted by Detective Majors was directly contradicted by Agent Brewer's testimony at the evidentiary hearing. Agent Brewer testified that Vaughn had volunteered to travel to Bristol, and that Detective Majors and another officer had driven him there.

Evans' recanting statements contain inconsistencies as well. In his first recanting statement, Evans stated that he would refuse to testify against Reginald Morton, and that this case was "based on lies [and] threats." (Hr'g Government's Ex. 13, June 18, 2009.) Yet in a later letter, Evans expressed a willingness to continue to cooperate. Not until his final letter did Evans state that he and Lee had fabricated their stories. At the evidentiary hearing, Evans claimed to have lied about his cooperation with Lee, but confirmed other aspects of his trial testimony.

Furthermore, the timing of the letters suggest that other defendants in this case pressured or manipulated Vaughn and Evans. After he had been jailed with Baumgardner, Vaughn wrote his first letter, which specifically mentions Baumgardner. Evans did not recant until he learned that he would testify at the fourth trial. Lee also wrote a recanting letter to the court, in which he claimed to have

- 27 -

exaggerated the extent of his cooperation with Evans, but at the fourth trial he testified that King had forced him to write it while they were jailed together.

Relatedly, the letters sent by Vaughn and Evans display inconsistent handwriting styles, which suggests that someone other than Vaughn or Evans wrote them, and I find the attempts by Vaughn and Evans to explain that fact unpersuasive.

At the evidentiary hearing, Vaughn and Evans acknowledged that they had breached their Plea Agreements and committed perjury. But they acknowledged as much not to enhance the credibility of their recantations, as Baumgardner and Stallworth argue here. They did so based on their mistaken and uninformed view that the concepts of duress, subornation of perjury, and coercion would ultimately set them free, irrespective of whether they adhered to the terms in their Plea Agreements, and regardless of whether they committed perjury. This does not demonstrate a sincere concern for the truth. Vaughn and Evans are simply trying to game the system.[5]

---

[5] Because I believe the trial testimony of Vaughn and Evans, I need not consider the remaining two factors under *Wallace*. *See United States v. Carmichael*, 726 F.2d 158, 159 (4th Cir. 1984) ("The failure to meet any of [these] requirements is fatal . . . .").

- 28 -

III

The evidence adduced at trial was sufficient for a reasonable jury to convict both Baumgardner and Stallworth of conspiracy to distribute, to attribute fifty grams or more of crack cocaine to Stallworth, and to convict Baumgardner of maintaining a place for drug distribution.

A

Both Baumgardner and Stallworth argue that there was insufficient evidence for a reasonable jury to find they were involved in the drug conspiracy that the government established at trial, and Stallworth argues that the evidence was insufficient to attribute fifty grams of crack cocaine to him. I disagree.

A conviction must be sustained if, viewed in the light most favorable to the government, there is substantial evidence to support it. *See Glasser v. United States*, 315 U.S. 60, 80 (1942). I must determine "whether 'any rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt.'" *United States v. Capers*, 61 F.3d 1100, 1107 (4th Cir. 1995) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Although a motion for a new trial may also be based on insufficient evidence, "a court 'should exercise its discretion to grant a new trial "sparingly," and . . . it should do so "'only when the evidence weighs heavily against the verdict."'" *United*

- 29 -

*States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quoting *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997)).

To prove conspiracy, "'the government must show, first, that a conspiracy existed; then, that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy.'" *Capers*, 61 F.3d at 1107 (quoting *United States v. Bell*, 954 F.2d 232, 236 (4th Cir. 1992)).

Both defendants concede that the government proved a conspiracy, but contend that they never joined that conspiracy.

As the Fourth Circuit has explained "'one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities.'" *Id.* at 1108 (quoting *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993)). Indeed, there must only be "a slight connection between the defendant and the conspiracy to support conviction."[6] *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992).

The totality of the circumstances shown by the government may suffice to prove the agreement necessary for a conspiracy conviction. *See United States v.*

_____

[6] Baumgardner criticizes the "slight connection rule" as one which criminalizes "mere association." *See Burgos*, 94 F.3d at 878 (Michael, J., dissenting in part and concurring in part). However, as he acknowledges, that is the law in this circuit and must be applied here.

*Burgos*, 94 F.3d 849, 857-58 (4th Cir. 1996) (en banc). Because a conspiracy is typically covert, there is rarely any direct evidence of an agreement between the members. *See id.* at 857. In fact, a conspiracy may be proven entirely by circumstantial evidence, including "a defendant's 'relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy.'" *Id.* at 858 (alterations omitted) (quoting *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir.1984)).

I find that there was substantial evidence from which the jury could conclude beyond a reasonable doubt that both Baumgardner and Stallworth joined the charged conspiracy.

Evans testified that he sold Baumgardner three-and-a-half grams of crack four or five times during a one-year period, while typical users normally purchased only a half-gram or one gram. Vaughn explained that Baumgardner purchased quarter-ounces of crack from Mumphrey three to four times a day in 2007.[7] Indeed, Mumphrey had nicknamed Baumgardner his "VIP." (Stallworth Trial Tr. vol. I, 107, Oct. 28, 2008.) Mumphrey supplied Evans—during approximately a three-year period, Evans bought ounces of cocaine from him weekly. Calhoun, an addict,

---

[7] One ounce equals 28.35 grams.

testified that she took someone to Baumgardner to buy drugs. Meade testified that he had purchased small amounts of crack from Baumgardner at his house.

Stallworth distributed crack, too. Evans testified that Stallworth had served as a middleman, and had purchased half-grams, grams, and eight-balls (3.5 grams) of crack from him three times a week.[8] Vaughn testified that for one year Stallworth had regularly purchased quarter-ounces of crack from Mumphrey at a motel in Bristol, Tennessee. When Mumphrey moved his operation to a mobile home on Anderson Street, Stallworth went there to buy half-grams and eight-balls.

Lee testified for the government. Evans partnered with Lee. At times, Lee would supply Evans, and on one occasion, Lee and Evans combined resources to buy drugs and divided the proceeds from the sale of those drugs evenly. Lee testified that he had met Stallworth through Evans at Cato's house. Evans rented the bottom half of Cato's house to distribute drugs, and Lee had witnessed Stallworth buy "an eight-ball to a quarter" of crack there. (*Id.* at 150.) Additionally, Norton testified that he had purchased a half-gram of crack from Stallworth. From this evidence the jury could reasonably infer that both Baumgardner and Stallworth served as low-level

---

[8]  Though at trial Evans was unable to indicate when this relationship began, he testified that it continued until he was "locked up in Sullivan County" in November 2007 in Tennessee. (Stallworth Trial Tr. vol. I, 17, Oct. 28, 2008.)

street distributors for the Evans drug organization, and could reasonably attribute fifty grams or more of crack to Stallworth.

Both defendants maintain that this evidence is insufficient for a conspiracy conviction because it merely established a buyer-seller relationship between them, citing cases from the Seventh and Tenth Circuits.[9]

I disagree that the evidence demonstrated nothing more than a buyer-seller relationship. Calhoun and Meade both testified that Baumgardner had sold crack. Baumgardner bought substantial amounts of crack from Evans and Mumphrey. Lee witnessed Stallworth buy crack from Evans at Cato's house, and Norton testified that he had bought crack from Stallworth.

In sum, the evidence showed that Baumgardner and Stallworth frequently bought crack from high-level members of the Evans drug organization and sold it to various users on multiple occasions. This certainly qualifies as more than "evidence of a buy-sell transaction." *United States v. Mills*, 995 F.2d 480, 485 n.1 (4th Cir. 1993). And even if it did not, "evidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators." *Id.*

---

[9] *See United States v. Goines*, 988 F.2d 750, 759 (7th Cir. 1993); *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991); *United States v. Kimmons*, 917 F.2d 1011, 1016 (7th Cir. 1990); *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir. 1979).

I find that, viewed in the light most favorable to the government, there was substantial evidence to prove beyond a reasonable doubt that Baumgardner and Stallworth participated in the conspiracy proven at trial and that fifty grams or more of crack cocaine were attributable to Stallworth.

B

Baumgardner also challenges his conviction under 21 U.S.C.A. § 856(a)(1), which states that "it shall be unlawful to . . . knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance . . . ."

Baumgardner contends that the government must prove that his "sole, primary and/or exclusive 'purpose' for maintaining [his] residence" was to distribute drugs. (Def.'s Mot. for J. of Acquittal & New Trial 7.) I disagree.

The Fourth Circuit has not articulated what is required of the government for it to prove the "for purpose of" element in 21 U.S.C.A. § 856(a)(1). Other courts are in disaccord. *See, e.g.*, *United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995) (stating that "at least in the residential context, [the drug activity] must be at least one of the primary or principal uses to which the house is put"); *United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993) (determining whether the defendant maintained the premises as a "supervisor, manager, or entrepreneur"); *United States v. Church*, 970

- 34 -

F.2d 401, 406 (7th Cir. 1992) (finding the evidence sufficient when it "established significant commercial sales").

To the extent Baumgardner reads the statute to penalize only those who maintain residences for the exclusive purpose of illegal drug activity, he ignores the plain language. *See United States v. Roberts*, 913 F.2d 211, 220 (5th Cir. 1990) (explaining that if Congress intended such a limited meaning, "it would have said so"). That restricted view "would eviscerate the statute, since it is highly unlikely that anyone would openly maintain a place for the purpose of manufacturing and distributing cocaine without some sort of 'legitimate' cover . . . ." *Id.*

Nor must the government prove that the drug activity was the primary purpose of maintaining the place, but rather must show only that the drug activity was a significant purpose. *See United States v. Soto-Silva*, 129 F.3d 340, 346 n. 4 (5th Cir. 1997) (stating that the statute "does not require that drug distribution be the *primary* purpose, but only a significant purpose"); *United States v. Gibson*, 55 F.3d 173, 181 (5th Cir. 1995) (affirming conviction because the drug activity "was one of the purposes for which [the defendant] maintained the [premises]").

Based on these principles, the jury received the following instruction at trial:

> To find the defendant guilty of this crime the government must prove beyond a reasonable doubt that he:

- 35 -

(1)    knowingly or intentionally;

(2)    opened, leased, rented, used or maintained a place;

(3)    for the purpose of distributing a controlled substance.

The government is not required to prove that the drug activity was the primary purpose of defendant's using or maintaining a place, but instead must prove that drug activity was a significant reason why [the] defendant used or maintained the place.

(Instruction No. 19.)

I find that there was substantial evidence from which the jury could convict Baumgardner of knowingly maintaining a place for the distribution of a controlled substance.

Baumgardner resided at 1007 New Hampshire Avenue in Bristol, Virginia. Norton testified that in addition to smoking crack there, he had bought drugs from individuals at that house on a regular basis. He explained how drugs were distributed: A customer would place an order for drugs in one section of the house and then proceed to a different room in the back where the drugs were delivered. Calhoun testified that she had taken a buyer to the house, who then purchased drugs from Baumgardner. Meade also bought crack from Baumgardner at this location.

As a member of a DEA task force in Roanoke, Virginia, Detective Anthony Ayers executed a search warrant at Baumgardner's house. At trial, he explained that

- 36 -

he had discovered syringes and crack pipes lying across the floor. He also found digital scales, which he characterized as instruments that drug dealers employ in their trade.

From this evidence the jury could reasonably infer that the distribution of drugs was a significant reason why Baumgardner maintained the residence. Thus, the jury could conclude beyond a reasonable doubt that Baumgardner knowingly maintained a place for the distribution of a controlled substance. [10]

IV

Baumgardner and Stallworth contend that the government failed to disclose evidence that could have been used to impeach Vaughn, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

---

[10]  For support, Baumgardner cites *United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991) and *United States v. Clavis*, 956 F.2d 1079 (11th Cir. 1992). *Tamez* held that under 21 U.S.C.A. § 856(a)(2), the government need not prove that the defendant intended to engage in drug activity by opening or maintaining a place as is required under 21 U.S.C.A. § 856(a)(1), since that would render § 856(a)(2) superfluous. 941 F.2d at 774. In *Clavis*, the court considered "acts that might constitute knowingly maintaining," which are different than "the statutory purpose acts, . . . of manufacturing, distributing, or using." 956 F.2d at 1091 (internal quotes omitted).

Neither *Tamez* nor *Clavis* speaks to the relevant issue here. Baumgardner was not convicted of violating 21 U.S.C.A. § 856(a)(2). Nor does he claim that the government failed to prove that he knowingly maintained the house in question.

- 37 -

In *Brady v. Maryland*, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The three necessary elements of a *Brady* claim are: "(1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material." *Monroe v. Angelone*, 323 F.3d 286, 299-300 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In this context, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). The disclosure requirement covers both impeachment material and other exculpatory evidence. *Id.*

Baumgardner and Stallworth maintain that the government failed to disclose that Detective Majors had promised Vaughn that he would not be charged with drug offenses in state court.

It is unclear from the record whether Agent Brewer had concrete knowledge of any promise made by Detective Majors to Vaughn. At the evidentiary hearing,

- 38 -

Agent Brewer testified that while he spoke to Vaughn at a proffer session, he had been "under the impression" that Vaughn "was not going to be charged with [previous] drug buys in Burlington." (Hr'g Tr. 135, June 18, 2009.) But Agent Brewer was unsure as to whether Detective Majors had told Vaughn that he would not be charged in North Carolina, and he was unsure as to whether Vaughn had expected to avoid any state charges in Virginia or Tennessee through his cooperation. He confirmed that he "wouldn't know what Mr. Majors did or did not say to Mr. Vaughn about those charges[.]" (*Id.* at 129.)

Assuming that Detective Majors promised Vaughn that he would not be charged with a state offense, I find that even if the government had disclosed this information, the result of the proceeding would not have been any different. Even without Vaughn's testimony, the evidence against Baumgardner and Stallworth was sufficient to convict them beyond a reasonable doubt. Vaughn's testimony that Baumgardner bought large quantities from Mumphrey was corroborated by Evans, who also sold Baumgardner non-user amounts, and by Calhoun and Meade, who bought from Baumgardner. That Stallworth bought large amounts from Mumphrey was corroborated by Evans' testimony that Stallworth acted as a middleman, and by Norton's testimony that he bought from Stallworth. Under these circumstances, the presumed failure to disclose was not material.

V

For the foregoing reasons, it is **ORDERED** as follows:

1.      The Motion for Judgment of Acquittal Or in the Alternative for a New

Trial on behalf of Bruce Edward Baumgardner is DENIED; and

2.      The Motion for Judgment of Acquittal, the Motion for New Trial, and

the Second Motion for New Trial on behalf of Douglas Lee Stallworth

is DENIED.

ENTER: August 6, 2009

/s/ JAMES P. JONES

Chief United States District Judge

- 40 -